O

1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    CENTRAL DISTRICT OF CALIFORNIA

10

11   JON VAN DYKE,                      CASE NO. SACV 13-454-JST (ANx)

12          Plaintiff,

13      vs.

14                                      **ORDER GRANTING IN PART AND**
                                        **DENYING IN PART DEFENDANT**
15   LIONS GATE ENTERTAINMENT, INC.     **FRIENDS MEDIA, LLC'S MOTION**
     etc., et al.,                      **TO DISMISS**
16

17          Defendants.

18

19

20

21

22

23

24

25

26

27

28

1    Before the Court is Defendant Friends Media, LLC's Motion to Dismiss Plaintiff's
2    First Amended Complaint.  (Mot., Doc. 15.)  Plaintiff Jon Van Dyke opposed, and Friends
3    Media replied.  (Opp'n, Doc. 17; Reply, Doc. 20.)  Having reviewed the papers and
4    considered the arguments of counsel at the hearing, the Court GRANTS IN PART and
5    DENIES IN PART Defendant's Motion.

6

7    **I. Background**

8    In January 2010, Van Dyke was employed as director of the media department of
9    the Yorba Linda Friends Church (the Church).  (First Am. Compl. ("FAC") ¶ 13, Doc. 12.)
10   At that time, Brent Martz was Van Dyke's supervisor.  (*Id.* ¶ 14.)  On or about January 6,
11   2010, Defendant Friends Media entered into an agreement ("the Agreement") with Van
12   Dyke "to secure the rights to a screenplay" Van Dyke wrote.  (*Id.* ¶ 15.)

13   Pursuant to the agreement, Martz was deemed to be a co-author of the screenplay
14   and entitled to 50% of the compensation for it.  (*Id.*)  Martz, however, allegedly did not
15   make any "copyrightable (or other substantive)" contributions to the screenplay.  (*Id.*)  Van
16   Dyke further alleges that Martz was in a position to, and in fact did, exercise undue
17   influence and/or coercion on Van Dyke in connection with the execution of the
18   Agreement.  (*Id.* ¶ 16.)  Specifically, Martz told Van Dyke that he (Van Dyke) would be
19   fired from the Church if he did not sign the agreement.  (*Id.*)[1]

20   After that, Van Dyke worked full-time for both the Church and Friends Media for
21   roughly two and a half years.  (*Id.* ¶ 17.)  During that time, he was employed with Friends
22   Media "as writer and director" of the film *Not Today* ("the Film").  (*Id.*)

23   Van Dyke and Friends Media attempted to "negotiate a written agreement . . . for
24   the rendition of [Van Dyke's] services as director of the film," but no agreement was ever

25
26
27   [1] Van Dyke, as will be discussed below, alleges alternatively that his agreement with Friends
     Media was and was not written.
28

1  consummated, and Van Dyke never received compensation for his work as director of the

2  Film.  (*Id.* ¶ 18.)

3      Van Dyke alleges that he is entitled to "contingent compensation" in connection

4  with the Film.  (*Id.* ¶ 20.)  He further alleges that Friends Media fraudulently increased the

5  Film's budget from $650,000 to $1.8 million in an effort to reduce or eliminate Van

6  Dyke's compensation on the "back end."  (*Id.* ¶¶ 20, 40.)

7      Lions Gate is the distributor of the Film, which was released on April 12, 2013.  (*Id.*

8  ¶¶ 19, 23.)  After the Film's release, Van Dyke again raised the issue of his compensation

9  as director, and he requested an accounting.  (*Id.* ¶ 22.)  Shortly thereafter, "he was

10  unceremoniously terminated" by the Church.  (*Id.*)

11      On the basis of these allegations, Van Dyke asserts various claims: (1) declaratory

12  relief; (2) constructive trust; (3) accounting; (4) quantum meruit; (5) breach of contract; (6)

13  fraud by concealment; (7) rescission; (8) failure to pay overtime wages in violation of Fair

14  Labor Standards Act; (9) failure to pay all straight time and/or overtime wages in violation

15  of the California Labor Code; (10) waiting time penalties; and (11) violation of California

16  Business & Professions Code § 17200, *et seq.*

17

18  **II. Legal Standard**

19      When evaluating a Rule 12(b)(6) motion, the Court must accept as true all

20  allegations of material facts that are in the complaint and must construe all inferences in

21  the light most favorable to the non-moving party.  *See Moyo v. Gomez*, 32 F.3d 1382, 1384

22  (9th Cir. 1994).  Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a

23  "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.

24  R. Civ. P. 8(a)(2).  Dismissal of a complaint for failure to state a claim is not proper where

25  a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face."

26  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility

27  when the plaintiff pleads factual content that allows the court to draw the reasonable

28

inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 556).  A complaint must (1) "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  "Although for the purposes of a motion to dismiss [the Court] must take all of the factual allegations in the complaint as true, [it] '[is] not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Moreover, "where a complaint includes allegations of fraud, Federal Rule of Civil Procedure 9(b) requires more specificity including an account of the 'time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations.'"  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (quoting *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1066 (9th Cir. 2004)).  "A pleading is sufficient under rule 9(b) if it identifies the circumstances constituting fraud so that a defendant can prepare an adequate answer from the allegations."  *Moore v. Kayport Package Express, Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

In considering the motion, the Court is limited to the allegations on the face of the complaint (including documents attached thereto), matters which are properly judicially noticeable and "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds in Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002).

4

1  **III. Discussion**

2         Friends Media moves to dismiss all of Van Dyke's claims.  Accordingly, the

3  Court considers the claims in turn.

4

5         **Claim 1: Declaratory Relief**

6         Van Dyke's first claim is for a declaration that he is the sole or joint owner of the

7  copyright in the Film.  (FAC ¶ 33.)  Friends Media raises a variety of challenges to this

8  claim.  First, it contends that the requisite "case or controversy" requirement is lacking

9  such that the Court cannot declare the rights or obligations of the parties.  (Mot. at 4.)  The

10 Court disagrees.  A case or controversy is ripe if the court finds "a substantial controversy,

11 between parties having adverse legal interests, of sufficient immediacy and reality to

12 warrant the issuance of a declaratory judgment."  *MedImmune, Inc. v. Genentech, Inc.,* 549

13 U.S. 118, 127 (2007) (internal quotation marks omitted).  This requirement is satisfied, as

14 Van Dyke is claiming that he is presently entitled to copyright ownership in the Film,

15 which has been released to theaters.

16        Next, Friends Media argues that Van Dyke is an employee of Friends Media and the

17 Church, and as such he is not a copyright owner in the Film.  Under the Copyright Act, a

18 "work made for hire" includes "a work prepared by an employee within the scope of his or

19 her employment."  17 U.S.C. § 101.  In cases of a work made for hire, "the employer or

20 other person for whom the work was prepared is considered the author for the purposes [of

21 the copyright laws], and, unless the parties have expressly agreed otherwise in a written

22 instrument signed by them, owns all of the rights comprised in the copyright."  *Id.* §

23 201(b).

24        Thus, *if* Van Dyke were an employee at the time the Film was made, then absent an

25 agreement to the contrary, his employer would be the owner of the copyright in the Film.

26

27

28

1    However, Van Dyke asserts alternative claims.[2]  This claim relies upon the assumption that

2    ultimately it will be determined that he was not an "employee."  He asserts other wage-

3    and-hour claims based on the assumption that it will be determined that he was an

4    "employee."  He may plead these alternative theories.  This is particularly so in light of the

5    fact that employment status is a highly fact-specific inquiry.  *See, e.g.*, *Narayan v. EGL,*

6    *Inc.*, 616 F.3d 895 (9th Cir. 2010).

7         Third, Friends Media argues that this claim is really a copyright infringement claim,

8    and such a claim must fail because copyright registration is a prerequisite to a suit for

9    infringement.  (Mot. at 5.)  This argument rests on a faulty premise.  Van Dyke is not

10   alleging that Friends Media is *infringing* his copyright (by, for example, illegally

11   duplicating the Film); rather, he is alleging that he is entitled to a declaration that he is an

12   owner (joint or sole) of the copyright in the Film.

13        The Motion is denied as to this claim.

14

15        **Claim 2: Constructive Trust**

16        Van Dyke's second claim is for a constructive trust of the Film's "revenues and

17   profits" held by Lions Gate and Friends Media.  A constructive trust is an equitable *remedy*

18   designed to prevent unjust enrichment.  *See* 13 Witkin, Summary of Cal. Law, Trusts §

19   319 (10th ed. 2005).  Accordingly, the Court construes this claim as one for restitution.

20   "Under the law of restitution, an individual may be required to make restitution if he is

21   unjustly enriched at the expense of another."  *Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51

22   (1996).  "A person is enriched if he receives a benefit at another's expense."  *Id.*  However,

23   "[e]ven when a person has received a benefit from another, he is required to make

24   restitution only if the circumstances of its receipt or retention are such that, as between the

25

26   _____

27        [2] Friends Media concedes that Van Dyke may plead in the alternative.  (*See* Reply at 2.)

28

1  two persons, it is unjust for him to retain it." *Id.* (internal quotation marks and citation

2  omitted).

3       Van Dyke's restitution claim is predicated on his allegation that he was owed

4  "contingent compensation" based upon the Film's profits, and that Defendants increased

5  the Film's budget from $650,000 to $1.8 million "for the purpose of paying large amounts

6  of money to insiders," and to mislead Van Dyke "into believing that the budget was

7  smaller than it actually was and hence into believing his expected 'back end' earnings were

8  greater."  (FAC ¶¶ 39-40.)

9       This allegation—that Friends Media engaged in a subterfuge or ruse to mislead Van

10  Dyke into believing his contingent compensation would be larger than it was—is sufficient

11  to sustain a claim for restitution.

12       The Motion is denied as to this claim.

13

14  **Claim 3: Accounting**

15       Van Dyke's third claim is for an accounting.  This claim is related to the

16  constructive-trust claim and based upon the same allegations, namely Van Dyke's

17  assertion that he is owed money under his agreement for "contingent compensation."  An

18  accounting is an equitable claim "for an amount which is unliquidated and unascertained

19  and which cannot be determined without an accounting."  *St. James Church of Christ*

20  *Holiness v. Superior Court In & For Los Angeles Cnty.*, 135 Cal. App. 2d 352, 359 (1955).

21       While Friends Media correctly points out that *St. James Church* holds that an

22  equitable action for accounting will not lie if none is necessary, what Van Dyke seeks is

23  necessarily an unascertained sum—a portion of the Film's profits.

24       The Motion is denied as to this claim.

25

26

27

28

1       **Claim 4: Quantum Meruit**

2       Van Dyke's fourth claim, for quantum meruit, is predicated upon the same

3 allegations as his constructive trust / restitution claim—*i.e.*, that he worked as the Film's

4 director (including spending ten weeks in India) but was not compensated. (FAC ¶ 50.)

5 As alleged, this is duplicative of his restitution claim. "'Quasi-contract' is simply another

6 way of describing the basis for the equitable remedy of restitution when an unjust

7 enrichment has occurred. Often called quantum meruit, it applies [w]here one obtains a

8 benefit which he may not justly retain. . . . The quasi-contract, or contract 'implied in

9 law,' is an obligation created by the law without regard to the intention of the parties, and

10 is designed to restore the aggrieved party to his former position by return of the thing or its

11 equivalent in money." *McBride v. Boughton*, 123 Cal. App. 4th 379, 388 n.6 (2004)

12 (quotation marks omitted).

13       Because this claim is duplicative of Van Dyke's constructive trust / restitution

14 claim, it is dismissed without prejudice.

15

16       **Claim 5: Breach of Contract**

17       Alternatively, Van Dyke alleges he entered into a *written* agreement with Friends

18 Media on or about January 6, 2010. (FAC ¶ 54.) He alleges that Friends Media breached

19 that agreement by, *inter alia*, surreptitiously increasing the Film's budget to $1.8 million to

20 dilute the Film's profits and Van Dyke's contingent payment. (*See* FAC ¶¶ 40, 56.) "The

21 standard elements of a claim for breach of contract are (1) the contract, (2) plaintiff's

22 performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to

23 plaintiff therefrom." *Abdelhamid v. Fire Ins. Exch.*, 182 Cal. App. 4th 990, 999 (2010)

24 (internal citation and quotation marks omitted).

25       Friends Media argues that Van Dyke has not sufficiently alleged the terms of the

26 written agreement, yet this objection is not well taken. While the allegations in this regard

27 are sparse, they are sufficient to support a claim for breach of a written contract. Van

28

Dyke has alleged that he entered into the written agreement in January 2010, pursuant to which Martz was to be designated a co-author of the screenplay and entitled to half of "compensation generated from the Film." (FAC ¶ 15.) Moreover, the alleged contract also provided that Van Dyke's compensation was to be calculated based upon the Film's profits. (*Id.* ¶ 44.)

However, Van Dyke does not allege which term of the contract Friends Media violated. (*See* FAC ¶ 54 ("Implied in said Agreement is a covenant of good faith and fair dealing.").) Accordingly, Van Dyke's breach-of-contract claim is dismissed without prejudice.

### Claim Six: Fraud by Concealment

Next, Van Dyke asserts a claim for fraud by concealment based upon Friends Media's actions with respect to the Film's budget, and its representations to Van Dyke that there was no money available for production, while Friends Media paid "large amounts of money to insiders, including Martz." (FAC ¶ 59.)

"Concealment is a species of fraud or deceit. [T]he elements of an action for fraud and deceit based on concealment are: (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage." *Blickman Turkus, LP v. MF Downtown Sunnyvale, LLC*, 162 Cal. App. 4th 858, 868 (2008) (internal citations and quotation marks omitted).

Friends Media challenges this claim on the basis of a lack of particularity as mandated by Rule 9. Van Dyke has sufficiently pleaded each of the elements of this claim. Unlike a fraud claim where a plaintiff can (or should be able to) point to a specific

misrepresentation and identify who said it, when it was said, and how it is false, with a fraudulent concealment claim, no representation was made—that is the problem.  Van Dyke has sufficiently alleged that Friends Media concealed from him its inflation of the Film's budget for the purpose of reducing the Film's profitability and in turn reducing Van Dyke's compensation.

The Motion is denied as to this claim.


**Claim 7: Rescission**

Van Dyke next asserts a claim for rescission, based upon his allegation that he was coerced into signing the written agreement when Martz threatened to fire him if he did not sign.  (FAC ¶ 66.)  The California Civil Code provides that a party may unilaterally rescind a contract "[i]f the consent of the party rescinding, or of any party jointly contracting with him, was given by mistake, or obtained through duress, menace, fraud, or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party." Cal. Civ. Code § 1689(b)(1).

"Undue influence . . . is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment.  The hallmark of such persuasion is high pressure, a pressure which works on mental, moral, or emotional weakness to such an extent that it approaches the boundaries of coercion." *Odorizzi v. Bloomfield Sch. Dist.*, 246 Cal. App. 2d 123, 130 (1966) (internal citation omitted).  The plaintiff in *Odorizzi* was a public school teacher who was charged with a crime.  A school official confronted the teacher at his house shortly after the teacher's arrest and told him that he (the teacher) would be suspended, dismissed, and publicly humiliated if he did not resign.  The teacher submitted his resignation, and then brought an action for rescission after the charges were subsequently dismissed.  The trial

10

1   court dismissed the complaint, but the court of appeal reversed, concluding that the teacher

2   had adequately pleaded a claim for rescission based upon undue influence.

3          Here, Van Dyke alleges that he was threatened with termination if he did not sign

4   the written agreement.  That is sufficient at the pleading stage to allege a claim for

5   rescission.

6          The Motion is denied as to this claim.

7

8          **Claims 8, 9, and 10: Failure to Pay Overtime Wages in Violation of the Fair
           Labor Standards Act; Failure to Pay All Straight Time and/or Overtime
9          Wages in Violation of the California Labor Code; Waiting Time Penalties**

10          Van Dyke next asserts a claim for failure to pay overtime wages in violation of

11   29 U.S.C. § 207 and claims under the California Labor Code for failure to pay straight-

12   time and/or overtime wages.  Friends Media's sole contention is that Van Dyke has not

13   sufficiently pleaded these claims in failing to plead "which week, which month" he worked

14   overtime or how many hours of straight time or overtime he worked during each week or

15   month.  (Mot. at 15.)

16          Friends Media does not provide authority for that proposition, and the Court

17   declines to impose that pleading obligation on Van Dyke.

18          The Motion is denied as to these claims.

19

20          **Claim 11: Violation of Business & Professions Code § 17200**

21          Van Dyke's final claim is for violation of Business & Professions Code section

22   17200 based upon the alleged violations of the California Labor Code.  (FAC ¶ 85.)

23   Because Section 17200 borrows other statutes and makes violations of those statutes

24   independently actionable, violations of the California Labor Code are also violations of

25   Section 17200.  *See Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1206 (2011) ("the failure

26   to pay legally required overtime compensation falls within the UCL's definition of an

27   'unlawful . . . business act or practice'").

28

11

The Motion is denied as to this claim.

**IV. Conclusion**

For the foregoing reasons, the Motion is GRANTED IN PART and DENIED IN PART as follows:

Claims 4 and 5 are dismissed without prejudice.

Any amended complaint must be filed within 21 days of this Order.

DATED:  July 24, 2013                          JOSEPHINE STATON TUCKER
                                  _____
                                        JOSEPHINE STATON TUCKER
                                        UNITED STATES DISTRICT JUDGE