O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JON VAN DYKE,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>LIONS GATE ENTERTAINMENT, INC., et al.,<br><br>　　　　Defendants. | CASE NO. SACV 13-454-JLS (ANx)<br><br>**ORDER DENYING MOTION FOR JUDGMENT ON THE PLEADINGS (Doc. 35)** |

Before the Court is Defendant Lions Gate Entertainment, Inc.'s Motion for Judgment on the Pleadings. (Mot., Doc. 35.) Plaintiff Jon Van Dyke opposed, and Lions Gate replied. (Opp'n, Doc. 39; Reply, Doc. 41). The Court finds this matter appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15. Accordingly, the hearing set for March 14, 2014 at 2:30 p.m. is VACATED. For the reasons stated below, the Court DENIES the Motion.

I.  **Background**

In January 2010, Van Dyke was employed as director of the media department of the Yorba Linda Friends Church. (Second Am. Compl. ("SAC") ¶ 13, Doc. 28.) At that time, Brent Martz was Van Dyke's supervisor. (*Id.* ¶ 14.) On or about January 6, 2010, Defendant Friends Media entered into an agreement ("Screenplay Agreement") with Van Dyke and Martz to secure the rights to a screenplay that Van Dyke allegedly wrote. (*Id.* ¶ 15; *see* Screenplay Agreement, Ans. Ex. A, Doc. 33-1; Mot. Ex. A.)[1,2] The screenplay was titled *Not Today*. (Screenplay Agreement at 1.) Under the terms of the agreement, Van Dyke:

---

[1] As Van Dyke's Second Amended Complaint specifically refers to the Screenplay Agreement, Lions Gate provides a declaration authenticating the version of the agreement it included in its briefing, and Van Dyke does not dispute its authenticity, the Court will consider the agreement in ruling on the Motion. *Branch v. Tunnell*, 14 F.3d 449, 453-54 (9th Cir. 1994), *overruled on other grounds in Galbraith v. Cnty. of Santa Clara*, 307 F.3d 1119 (9th Cir. 2002). The Court does not find persuasive Van Dyke's argument in passing that the agreement is void because the first page states it was entered into on January 1, 2009, but Friends Media allegedly came into existence in August 2009. (Opp'n at 2 n.1.) The exhibits to the agreement—which contain Van Dyke's notarized signature—have a handwritten date of January 6, 2010 ("09" is crossed out by hand and replaced "10"), and Van Dyke repeatedly alleges the agreement was entered into on January 6, 201**0**. (SAC ¶¶ 15, 61.)

[2] In a separate Order filed concurrently with this Order, the Court has sealed the filings of the Screenplay Agreement and ordered Lion Gate to file redacted copies of the agreement due to sensitive information contained therein.

2

  (1) sold, assigned, transferred and granted to Friends Media any and all right, title and interest to the screenplay, with minor exceptions (Screenplay Agreement ¶¶ 3, 8, 9, Ex. C);

  (2) agreed that the results of his services in connection with the screenplay were created by him as a "work-made-for-hire" for Friends Media, and Friends Media is the sole author and owner of those materials (*id*. ¶ 8);

  (3) waived the right to rescind the agreement and agreed that any damages caused by a breach were not irreparable or otherwise sufficient to entitle him to seek injunctive or equitable relief.  (*Id*. ¶ 16.)

Although Martz and Van Dyke were deemed coauthors under the Screenplay Agreement and were to split compensation for their work as writers, (SAC ¶ 15; Screenplay Agreement ¶ 2(a)), Martz allegedly did not make any copyrightable or other substantive contributions to the screenplay.  (SAC ¶ 15.)  Van Dyke further alleges that Martz was in a position to, and in fact did, exercise undue influence and/or coercion on Van Dyke in connection with the execution of the Screenplay Agreement.  (*Id.* ¶ 16.)  Specifically, Martz told Van Dyke that the Church would fire him if he did not sign the Screenplay Agreement.  (*Id*.)

Thereafter, Van Dyke worked full-time for both the Church and Friends Media for roughly two and a half years.  (*Id.* ¶ 17.)  During that time, he was employed by Friends Media "as writer and director" of a film titled *Not Today* ("Film").  (*Id*.)  Van Dyke and Friends Media attempted to "negotiate a written agreement . . . for the rendition of [Van Dyke's] services as director of the Film," but no agreement was ever reached, and Van Dyke never received compensation for his work as director of the Film.  (*Id.* ¶ 18.)

Van Dyke alleges that he is entitled to "contingent compensation" in connection with the Film.  (SAC ¶ 20.)  He further alleges that Friends Media fraudulently concealed an increase in the Film's budget from $650,000 to $1.8 million, in a "likely" effort to

3

mislead Van Dyke into believing his "back end" compensation would be greater than it actually was. (*Id.* ¶¶ 20, 53.)

Lions Gate is the distributor of the Film. (*Id.* ¶ 23.) Van Dyke alleges that pursuant to an agreement with Friends Media ("Acquisition Agreement"), Lions Gate "has acquired an interest in the Film," is exploiting it, and has "entered into either a written joint venture agreement and/or an exclusive licensing or exclusive distribution agreement" with Friends Media, to exploit the Film. (*Id.* ¶¶ 23-24.) Lions Gate attached the Acquisition Agreement to its Answer and Motion. (Acquisition Agreement, Ans. Ex. B; Mot. Ex. B.) Pursuant to the agreement, Friends Media broadly granted to Lions Gate "all Home Video and Television Rights of each and every kind, nature and character whatsoever in and to the Picture and all elements thereof," including the "exclusive" right to reproduce, distribute, sell, and "otherwise exploit the Picture in all media whether now known . . . or hereafter devised." (Acquisition Agreement ¶¶ 2-4; *see also* Acquisition Agreement Schedule A.)[3]

After the Film's release on April 12, 2013, Van Dyke again raised the issue of his compensation as director, and he requested an accounting. (SAC ¶¶ 19, 22.) Shortly thereafter, the Church "unceremoniously terminated" him. (*Id.* ¶ 22.)

On the basis of these allegations, Van Dyke asserts two claims against Lions Gate, for declaratory relief and an accounting.

## II.     Legal Standard

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Motions for judgment on the pleadings are governed by the same standards applicable to Rule 12(b)(6) motions to

---

[3] As Van Dyke's Second Amended Complaint specifically refers to the Acquisition Agreement, Lions Gate provides a declaration authenticating the version of the agreement it included in its briefing, and Van Dyke does not offer any specific objection to its authenticity, the Court will consider the agreement in ruling on the Motion. *Branch*, 14 F.3d at 453-54.

1 dismiss. *Cafasso v. General Dynamics C4 Systems*, *Inc.,* 637 F.3d 1047, 1054 n. 4 (9th
2 Cir. 2011). "For purposes of the motion, the allegations of the non-moving party must be
3 accepted as true, while the allegations of the moving party which have been denied are
4 assumed to be false." *Hal Roach Studios v. Richard Feiner & Co., Inc.*, 896 F.2d 1542,
5 1550 (9th Cir. 1989) (citation omitted). "Judgment on the pleadings is proper when the
6 moving party clearly establishes on the face of the pleadings that no material issue of fact
7 remains to be resolved and that it is entitled to judgment as a matter of law." *Id*. (citation
8 omitted). "However, judgment on the pleadings is improper when the district court goes
9 beyond the pleadings to resolve an issue; such a proceeding must properly be treated as a
10 motion for summary judgment." *Id.* (citations omitted).

## III. Discussion

Lions Gate's Motion seeks judgment on the pleadings as to Van Dyke's claims against it for declaratory relief and an accounting. The Court finds that judgment on the pleadings is not proper as to either claim.

### A. Declaratory Relief Claim

The Court previously found that a determination of Van Dyke's rights may affect Lions Gate's rights, and therefore Van Dyke had stated a claim for declaratory relief against Lions Gate. (Lions Gate MTD Order at 5, Doc. 27.) Lions Gate has since answered the Second Amended Complaint, attaching the Screenplay Agreement and Acquisition Agreement. (Ans.)

Lions Gate argues that pursuant to the Screenplay Agreement, Van Dyke has no ownership interest in the Film's copyright, and as a result Van Dyke has no claim against Lions Gate. (Mem. at 2-3, 8-10.) Lions Gate recognizes that Van Dyke has brought a

claim against Friends Media to rescind the Screenplay Agreement,[4] but argues that Van Dyke is precluded from rescinding the agreement because (1) Van Dyke waived any right to do so by the terms of the contract and by his actions, (*id*. at 13-15); (2) Van Dyke is estopped from seeking rescission, (*id*. at 15-16; Reply at 15-16); and (3) Van Dyke's alleged delay in seeking rescission has substantially prejudiced Lions Gate. (Reply at 14-15.)

Lions Gate's waiver argument implicates factual issues that cannot be resolved at this stage. Waiver is a question of fact for the trial court, and waiver of a legally conferred right must be voluntary, knowing and done with adequate awareness of the relevant circumstances and likely consequences. *B.W. v. Bd. Of Med. Quality Assurance*, 169 Cal. App. 3d 219, 233 (1985); *Gould v. Corinthian Colleges, Inc*., 192 Cal. App. 4th 1176, 1179 (2011). As Van Dyke pleads that he entered the agreement under duress, and given the factual issues presented by certain of Lions Gate's waiver arguments, at this stage the Court cannot find as a matter of law that Van Dyke waived any right to rescind. (*See* Friends Media MTD Order at 10-11.)

Lions Gate's equitable estoppel argument—which depends on whether Van Dyke reasonably led Friends Media to believe he would not seek to rescind the Screenplay Agreement—cannot be resolved on the pleadings either. For example, while Lions Gate argues that Van Dyke led Friends Media to reasonably rely on the enforceability of the Screenplay Agreement, (Reply at 16), Van Dyke alleges that he repeatedly sought but did not receive compensation for his related services as director. (SAC ¶¶ 18, 22.) Van Dyke also alleges he requested an accounting with respect to the Film's budget, as an increase in the budget allegedly could have reduced his "back end" compensation. (*Id*. ¶¶ 22, 53-55.) The Court finds that determining whether any reliance by Friends Media was reasonable presents factual questions that the Court will not resolve on this Motion. *See Superior*

---

[4] The Court previously held that Van Dyke plausibly alleged a claim for rescission against Friends Media. (*See* Friends Media MTD Order at 10-11, Doc. 23.)

*Dispatch, Inc. v. Ins. Corp. of New York*, 181 Cal. App. 4th 175, 186-87 (2010) (reasonable reliance element of equitable estoppel is ordinarily a question of fact) (citation omitted).

Lions Gate's argument as to substantial prejudice is based in part on the claim that it has entered into sub-licensees with third parties. (Reply at 15.) However, no such allegations are before the Court, and the Court declines to consider matters outside the pleadings on this Motion.[5] Thus, at this stage, the Court will not find a claim for rescission is barred based on alleged substantial prejudice to Lions Gate.

Lions Gate further argues that, even absent the Screenplay Agreement, Friends Media would have joint ownership with Van Dyke of the Film's copyright due to Friends Media's role in making the Film. (Mem. at 10-12; Reply at 7-11.) In support of its argument, Lions Gate claims that Friends Media entirely financed the Film and hired numerous other third parties that made copyrightable contributions to the Film. (Mem. at 6, 8-9.) However, this is not alleged in the pleadings, nor does Lions Gate provide supporting evidence. Regardless, even if it were not plausible that Van Dyke were the sole owner of the Film's copyright, a determination of Lions Gate's rights under the Acquisition Agreement would still be required. A co-owner of a copyright cannot grant an exclusive right in the use of a copyright. *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1145 (9th Cir. 2008). Here, the terms of the Acquisition Agreement purport to grant "exclusive" rights to Lions Gate, and Lions Gate's Answer merely denies it was granted "all" exclusive rights. (*See* Acquisition Agreement ¶ 3, Schedule A; Ans. ¶ 24; *see also* SAC ¶ 24.) While Lions Gate claims that any exclusive license granted by one joint owner "would, by operation of law, simply be non-exclusive," (Mem. at 11), Lions Gate ignores the fact that this would require a judicial determination of its rights under the agreement. (*See* Lions Gate MTD Order at 5.)

---

[5] Even if the Court were to consider matters outside the pleadings, Lions Gate provides no evidence of any sub-licenses.

Accordingly, the Motion is DENIED as to this claim.

### B. Accounting Claim

Van Dyke's second claim against Lion's Gate is for an accounting. The Court previously found that Van Dyke adequately pleaded an accounting claim, "because a copyright 'transferee [such as an exclusive licensee] has an absolute duty to account to all of the joint owners.'" (*Id*. at 7 (quoting 1-6 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 6.12[c][3]).) (alteration in original). As Van Dyke's ownership rights in the Film's copyright have not been determined, and Lions Gate's purportedly "exclusive" license has not been declared non-exclusive (in the event Van Dyke and Friends Media are joint owners of the Film's copyright), the Court will not dismiss the accounting claim.[6]

Accordingly, the Motion is DENIED as to this claim.

### IV. Conclusion

For the foregoing reasons, the Motion is DENIED.

DATED: March 11, 2014

_____JOSEPHINE L. STATON_____
JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE

---

[6] Lions Gate argues that it is not a "transferee" because the Acquisition Agreement covers limited rights, for a limited time and territory. (Reply at 13.) However, as the agreement purports to grant *some* "exclusive" rights, it could be considered a "transfer of copyright ownership." *See* 17 U.S.C. § 101; *see also* 3-10 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 10.02[A] (exclusive license only to publish a hard-cover edition of book is a "transfer," as is an exclusive license limited to a particular geographic area and for a particular period of time).