UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JON VAN DYKE,<br><br>Plaintiff,<br><br>vs.<br><br>LIONS GATE ENTERTAINMENT, INC., et al.<br><br>Defendants. | CASE NO. SACV 13-454-JLS (ANx)<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Doc. 53)** |

# I. Introduction

Before the Court is Defendant Friends Media, LLC's Motion for Partial Summary Judgment. (Mot., Doc. 53.) Plaintiff Jon Van Dyke opposed, and Friends Media replied. (Opp'n Doc. 58; Reply Doc. 59.) Having considered the briefing, heard oral argument, and taken the matter under submission, the Court DENIES Friends Media's Motion.

# II. Background

In 2006, Jon Van Dyke was hired by Yorba Linda Friends Church as media director. (Jon Van Dyke Decl. ¶ 2, Doc. 58-3.) During his off-hours from 2008 to 2009, he wrote the screenplay for the film *Not Today*. ("Film"). (*Id.*) Brent Martz was Van Dyke's supervisor at the Church. (*Id.*)

On January 1, 2009, Van Dyke, Martz, and Friends Media entered into a Screenplay Agreement for the sale of the screenplay and the rights to a film based on the screenplay. (Statement of Uncontroverted Facts ("SUF") ¶ 1, Doc. 53-1; Brookman Decl. Ex. A ("Screenplay Agreement"), Doc. 53-3.) Friends Media financed the production of the Film in excess of $3.5 million. (SUF ¶ 7.)[1] Friends Media paid for services and obtained assignments of rights from multiple contributors to the Film, such as actors, producers, and editors. (*See id.* ¶ 8; Brookman Decl. Ex. B.)[2]

---

[1] Because Van Dyke admits this is undisputed, his boilerplate objections to the declaration and documents stating the same are overruled. (Statement of Genuine Issues ("SGI") ¶ 7, Doc. 58-4; Brookman Decl. ¶ 6; Pl. Objs. ¶ 4, Doc. 58-5.)

[2] Van Dyke objects to the contracts in Exhibit B on the ground that they do not specify whether the contributions were "creative or copyrightable," (SGI ¶ 8), and on the grounds that the documents are not properly authenticated, are hearsay, and are irrelevant. (Pl. Objs. ¶¶ 1-2.) Van Dyke's objections are overruled. For purposes of this Order, the Court need not determine whether every single contract involved creative contributions. Moreover, the declarant properly authenticates the exhibits (*see* Brookman Decl. ¶¶ 1, 3-5), the contracts are relevant, and they are
  (footnote continued)

Pursuant to the Screenplay Agreement, Van Dyke and Martz were paid $30,000 for the screenplay and were given the right to receive 20% of the profits from the Film. (SGI ¶ 2.) In return, among other things, Van Dyke agreed:

> **(1)** that "[a]ll of the results and proceeds of [Van Dyke's] services . . . in connection with the Screenplay and/or the Picture, and all materials of whatever kind or nature, including without limitation all material composed, submitted, added, created, or interpolated by [Van Dyke], . . . furnished or to be furnished, by [Van Dyke] . . . in connection with the Screenplay and/or the Picture ( . . . the 'Materials') . . . will be solely created by [Van Dyke] as a 'work made-for-hire' specially ordered or commissioned by Producer [Friends Media]. Accordingly, [Friends Media] shall be deemed the sole author of the Materials . . . . In the event the Materials are found not be a work-made-for-hire, [Van Dyke] hereby assigns . . . all rights, including all exclusive exploitation rights, . . . to [Friends Media]," (Screenplay Agreement ¶ 8. *See also* Brookman Decl. Ex. C, Doc. 58-6. (assigning right to produce and distribute motion pictures based on screenplay));
>
> **(2)** that he was an independent contractor for Friends Media, (Screenplay Agreement ¶ 13); and

---

not hearsay. Van Dyke's objections to the Screenplay Agreement are overruled for the same reasons.

3

**(3)** to waive the right to rescind the agreement, and that
                    any damages caused by a breach were not irreparable or
                    otherwise sufficient to entitle him to seek injunctive or
                    equitable relief. (*Id.* ¶ 16.)

According to Van Dyke, he was told on more than one occasion by Martz that if he did not sign the Screenplay Agreement he would be fired from the Church. (Van Dyke Decl. ¶ 4.)[3] Van Dyke executed the Agreement under this threat of termination. (*Id.* ¶ 5.)

Van Dyke worked approximately 11,500 hours from 2010 to 2012 on various aspects of the Film unrelated to the writing of the Film, including directing; producing; working with the editor; supervising color corrections; supervising the recording of the special music score; travelling; and writing, directing and shooting the epilogue and credit crawl. (*Id.* ¶ 9.)[4] Van Dyke claims his decisions were subject to approval from the executive producers of the film, and that he was routinely denied pre-budgeted expenses in connection with the Film, for example with respect to the use of specific scenes, locations, and actors. (*Id.* ¶¶ 13, 16-17.) Van Dyke also claims that the Film's executive producers made significant decisions regarding the Film, such as whether a particular scene was approved to be shot, who would be hired to perform other jobs in connection with filming, and

---

[3] Friends Media objects to this portion of paragraph four of Van Dyke's declaration on hearsay grounds and lack of foundation. (Def. Objs. at 1, Doc. 59-1.) The objections are overruled. The Court considers Martz' alleged statements for their effect on Van Dyke, not for the truth of the matter asserted. In addition, to the extent that Martz was speaking on behalf of Friends Media, it is a party admission.

[4] Friends Media objects to this statement on hearsay and foundation grounds. (Def. Objs. at 1-2.) As Van Dyke is providing testimony on the hours he worked, the foundation objection is overruled. The hearsay objection is also overruled. *See* Fed. R. Evid. 801(c)(1).

4

financial issues related to the Film. (*Id*. ¶ 15.) Many decisions regarding the Film, such as shooting locations, were made without Van Dyke's knowledge. (*Id*. ¶ 19.)

Van Dyke was terminated by the Church and Friends Media in August 2012. (*Id*. ¶ 6.) Van Dyke states he was not aware of his "right" to rescind until December 2012, when he retained counsel. (*Id*. ¶ 7.) On December 18, 2012, Van Dyke's counsel gave notice to Friends Media and the Church that Van Dyke intended to bring a claim for rescission of the Screenplay Agreement. (Stephen T. Lowe Decl. Ex. A, Doc. 58-2.) Van Dyke filed this action on March 19, 2013. (Doc. 1.) The Film was released on April 12, 2013. (Second Am. Compl. "SAC" ¶ 19, Doc 28; Answer ¶ 19, Doc. 33.)

Friends Media moves for summary judgment as to (1) Van Dyke's sixth cause of action for rescission of the Screenplay Agreement; (2) Van Dyke's "claim that he has sole ownership of the rights to the [Film], . . . as that issue concerns the First and Second Causes of Action" for declaratory relief and an accounting; and (3) Van Dyke's seventh through tenth causes of action, relating to his alleged employment with Friends Media. (Mot. at 2.)[5]

## III. Legal Standard

In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the

---

[5] Van Dyke's other pending causes of action against Friends Media are for restitution and fraudulent concealment. (SAC; Friends MTD Order, Doc. 23.)

5

non-movant's favor, and an issue is "material" when its resolution might affect the outcome of the suit under the governing law. *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, "the moving party . . . has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only point out to the [c]ourt that there is an absence of evidence to support the non-moving party's case." *Sluimer v. Verity, Inc.*, 606 F.3d 584, 586 (9th Cir. 2010). "Rule 56[(a)] mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Therefore, if the non-movant does not make a sufficient showing to establish the elements of its claims, the Court must grant the motion. *See In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) ("non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor").

## IV. Discussion

### A. Cause of Action for Rescission

Van Dyke seeks to rescind the Screenplay Agreement on the ground that he entered into the agreement under economic duress. Van Dyke provided notice of his intent to seek rescission of the Screenplay Agreement in December 2012, approximately four months after he was terminated and immediately after he obtained counsel and became aware of his "right" to rescind. Friends Media argues that Van Dyke's claim of economic duress is legally insufficient, and that he can no longer seek rescission of the Screenplay Agreement. (Mem. at 4-8; Reply at 3-8.)

Economic duress may exist "upon the doing of a wrongful act which is sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to succumb to the perpetrator's pressure." *Rich & Whillcock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1158 (Ct. App. 1984). A wrongful act can include an "assertion of a claim known to be false or a bad faith threat to breach a contract or to withhold a payment . . . for purposes of the economic duress doctrine." *Id*. at 1159. "Further, a reasonably prudent person subject to such an act may have no reasonable alternative but to succumb when the only other alternative is bankruptcy or financial ruin." *Id*.

"Subject to Section 1693, to effect a rescission a party to the contract must, promptly upon discovering the facts which entitle him to rescind if he is free from duress . . . and is aware of his right to rescind . . . give notice[.]" Cal. Civ. Code § 1691. "When relief based upon rescission is claimed in an action or proceeding, such relief shall not be denied because of delay in giving notice of rescission unless such delay has been substantially prejudicial to the other party." *Id*. § 1693. This requirement "is essentially one of freedom from laches." *Wilke v. Coinway, Inc.* 257 Cal. App. 2d 126, 140 (Ct. App. 1967). "Laches is an unreasonable delay in asserting an equitable right, causing prejudice to an adverse party such as to render the granting of relief to the other party inequitable." *Wells Fargo Bank v. Bank of Am.*, 32 Cal. App. 4th 424, 438 (Ct. App. 1995).

"A party asserting the defense of estoppel must establish the following elements: (1) the party estopped must know the facts; (2) the party estopped must engage in conduct intended to be acted upon by the party asserting estoppel; (3) the party asserting estoppel must be ignorant of the true state of facts; and (4) injury must result from reliance on the other's conduct. It is the burden of the party asserting estoppel to prove all of its requisite elements, and the doctrine is strictly

applied and must be substantiated in every particular." *Id*. at 437-38 (citations and quotation marks omitted).

As set forth above, Van Dyke signed the Screenplay Agreement under the threat of termination of his employment. There is no evidence before the Court of a reasonable alternative to signing the Screenplay Agreement. To the contrary, Van Dyke's salary from the Church was his only source of income and means to provide for his wife and children, including his diabetic step-son's medical bills. (Van Dyke Decl. ¶ 4.) The Court finds that Van Dyke has come forth with sufficient evidence from which a jury could reasonably render a verdict in his favor on the issue of economic duress, and that a genuine dispute of material fact exists as to whether the cause of the duress can be attributed to Friends Media. (*See* Lowe Decl. Ex. B at 51:5-16; *id.* Ex. C. at 11:6-25, 58:10-24; *id.* Ex. D at 10:20-21, 19:21-20:24; *id.* Ex. E at 10:11-12, 10:22, 11:6-9.)

As to laches, to the extent Van Dyke continued to be under duress until he was terminated, his delay in seeking rescission during this time period cannot be considered unreasonable as a matter of law. Moreover, whether Van Dyke acted "promptly" under section 1691 presents a question of fact. *See Hil-Mac Corp. v. Mendo Wood Prods., Inc*., 235 Cal. App. 2d 526, 529 (Ct. App. 1965). As such, the fact that Friends Media executed agreements with third parties before Van Dyke provided notice of rescission does not warrant granting summary judgment against Van Dyke on his claim for rescission.[6]

As to equitable estoppel, the Court finds a genuine dispute of material fact exists as to whether Friends Media could have reasonably relied on Van Dyke not to

---

[6] Friends Media argues for the first time in its Reply that Van Dyke cannot seek rescission because the rights of others have intervened and rescission may not be decreed without injury to them. (Reply at 8.) The argument is not properly before the Court. Even if it were, Friends Media does not explain how or why any particular individual or entity would be injured, and therefore fails to carry its burden on summary judgment.

seek rescission of the Screenplay Agreement. *Super. Dispatch, Inc. v. Ins. Corp. of New York*, 181 Cal. App. 4th 175, 186-87 (Ct. App. 2010). Further, if the duress is found to be attributable to Friends Media, then Friends Media cannot claim equitable estoppel as a defense. *See id.* at 187.

Finally, neither the Church nor Martz need be a party to the litigation in order for Van Dyke to state a claim for rescission, *see In re Real Estate Assocs. Ltd. P'ship Lit.*, 223 F. Supp. 2d 1109, 1139 (C.D. Cal. 2002), and the fact that Van Dyke has not yet tendered all of the benefits he received under the Screenplay Agreement does not prevent him from seeking rescission. *See* Cal. Civ. Code § 1693.

Accordingly, Friends Media's motion for partial summary judgment is DENIED with respect to the sixth cause of action for rescission.

**B.    Whether Van Dyke is the Sole Owner of the Copyright in the Film**

Friends Media seeks partial summary judgment on Van Dyke's "claim that he has sole ownership of the rights to the [Film], . . . as that issue concerns the First and Second Causes of Action" for declaratory relief and an accounting. (Mot. at 2. *See* Mem. at 8, 13; Proposed Order at 2.)

"The authors of a joint work are coowners of copyright in the work." 17 U.S.C. § 201(a). The Ninth Circuit has suggested several factors to consider when determining joint authorship in the absence of a contract.[7] *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1234 (9th Cir. 2000). "First, an author superintend[s] the work by exercising control. This will likely be a person who has actually formed the

---

[7] As Van Dyke's claim for rescission survives summary judgment, the Court evaluates this issue as though the Screenplay Agreement were rescinded. Van Dyke appears to concede that if the agreement were not rescinded, he cannot be the sole owner of the Film. (Opp'n at 14, 16.) In addition, Van Dyke appears to concede that if he is deemed an employee of Friends Media, he cannot be an owner of the Film. (*Id.* at 16.) *See* 17 U.S.C. §§ 101, 201(b).

9

picture by putting the persons in position, and arranging the place where the people are to be-the man who is the effective cause of that, or the inventive or master mind who creates, or gives effect to the idea." *Id*. at 1234(footnotes and quotation marks omitted). "Second, putative coauthors make objective manifestations of a shared intent to be coauthors[.]" *Id*. Third, the Court considers whether "the audience appeal of the work turns on both [parties'] contributions[.]" *Id*. (quotation marks omitted). "Control in many cases will be the most important factor," *id*., but "[t]he factors articulated . . . cannot be reduced to a rigid formula, because the creative relationships to which they apply vary too much." *Id.* at 1235.

      The Court finds that the issue of the Film's authorship raises a genuine dispute of material fact. Van Dyke claims that he was the "creative mastermind" of the film by virtue of writing and directing the Film. (*See* Opp'n at 15; Van Dyke Decl. ¶¶ 3, 8.) Van Dyke also claims he worked on various other creative aspects of the film, (*see* Van Dyke Decl. ¶ 9), and Friends Media relies in its briefing on a statement Van Dyke previously made to the Church, wherein Van Dyke claimed that he "wrote, directed and supervised every aspect of the film project Not Today . . . ." (Reply at 14 n.17.) However, Van Dyke also asserts that he did not have control over all filming decisions. (Van Dyke Decl. ¶¶ 15-19.) In addition, Friends Media provides evidence that it secured the efforts of actors, photographers, editors, and others who contributed to the Film, and from whom Friends Media obtained assignments of rights. (Brookman Decl. Ex. B.) While these agreements may show that others have (or had) copyrightable interests in the Film, they do not indisputably show that anyone, including Friends Media, is an "author" of the entire Film. Further, to the extent the Screenplay Agreement is considered rescinded, it is not a sufficiently reliable objective manifestation of the parties' intent as to ownership to support granting summary judgment in favor of Friends Media. Finally, the extent to which the parties' contributions created audience appeal presents a factual issue.

Considering the factors together, and drawing all reasonable inferences in favor of Van Dyke, the Court cannot conclude, as a matter of law, that Van Dyke cannot be the sole owner of the copyright in the Film.

Accordingly, Friends Media's motion for partial summary judgment is DENIED with respect to this issue.

### C. Employment-Related Causes of Action

Van Dyke's seventh through tenth causes of action are for failure to pay overtime wages in violation of 29 U.S.C. § 207; failure to pay all straight time or overtime in violation of California Labor Code §§ 510 and 1194; waiting time penalties under California Labor Code §§ 201 and 202; and unlawful business practices in violation of California Business & Professions Code § 17200, based on violations of California Labor Code §§ 223, 226, and 510 and violations of the Fair Labor Standards Act. (SAC at 11-14.)

In order to assert these causes of action, Van Dyke must be a non-exempt employee. Friends Media first argues that Van Dyke was "likely" an independent contractor, not an employee of Friends Media, because the Screenplay Agreement describes him as such. (Mem. at 11; Reply at 13-14; Screenplay Agreement ¶ 13.) The determination of whether Van Dyke is an employee or independent contractor is one of fact if it depends on the resolution of disputed evidence or inferences. *See S. G. Borello & Sons, Inc. v. Dept. of Industrial Relations*, 48 Cal. 3d 341, 349 (1989); *Estrada v. FedEx Ground Package Sys., Inc.*, 154 Cal. App. 4th 1, 11 (Ct. App. 2007). The determination depends in large part on the extent to which Van Dyke exercised control over the means of accomplishing the result desired by his work; the labels placed by the parties on their relationship is not dispositive. *See Borello*, 48 Cal 3d. at 349-50. Thus, the fact that the Screenplay Agreement, which was for Van Dyke's writing services, labels Van Dyke as an independent contractor is of

relatively little significance. The Court instead looks to the evidence of the control Van Dyke had over his work. As explained above, Van Dyke's declaration suggests he lacked control over significant decisions related to the Film. (*See* Van Dyke Decl. ¶¶ 13, 15-19.) Friends Media fails to address this evidence, instead focusing on Van Dyke's claim elsewhere in his briefing that he was the "creative mastermind" of the project. (Reply at 13-14.) Accordingly, the Court finds a genuine dispute of material fact exists as to whether Van Dyke was an independent contractor with respect to the services he rendered in connection with the filming of *Not Today*.

Friends Media further argues that even if Van Dyke were an employee, he is exempt. (Mem. at 11-13; Reply 14-15.) "The employer bears the burden of proving an employee is exempt." *Nordquist v. McGraw-Hill Broadcasting Co.*, 32 Cal. App. 4th 555, 562 (Ct. App. 1995). "Exemptions are narrowly construed against the employer and their application is limited to those employees plainly and unmistakably within their terms." *Id*. Friends Media argues that Van Dyke is subject to the Professional Exemption set forth by the California State Department of Industrial Relations' Industrial Wage Order ("IWO") for the Motion Picture Industry. (Mem. at 11.) The IWO sets forth several requirements for satisfying this exemption. First, the employee must be employed in a "learned or artistic" profession. Second, the employee must "customarily and regularly exercise[] discretion and independent judgment in the performance of duties . . . ." Third, the employee must "earn a monthly salary equivalent to no less than two times the state minimum wage for full-time employment." *See* IWO § 54.1.

Based on the evidence described above, the Court finds a genuine dispute of material fact exists as to what extent Van Dyke exercised discretion and independent judgment with respect to the services he rendered in connection with the filming of *Not Today*.

| | |
|---|---|
| 1 | A genuine dispute of material fact also exists as to whether Van Dyke was |
| 2 | provided a monthly salary by Friends Media equivalent to no less than two times the |
| 3 | state minimum wage for full-time employment, for these same services. Van Dyke |
| 4 | argues he received no monthly salary from Friends Media. (Opp'n at 23.) Friends |
| 5 | Media argues that Van Dyke was paid by the Church for his services as "Media |
| 6 | Director" for the Church, and that the fact that he was not paid by Friends Media for |
| 7 | his services in connection with the filming of *Not Today* is "merely an accounting |
| 8 | reconciliation." (Reply at 14-15.) Van Dyke was employed by the Church as a |
| 9 | Media Director prior to when he began providing his services to Friends Media in |
| 10 | connection with the filming of *Not Today*, and the evidence before the Court does |
| 11 | not show that Van Dyke's compensation for his position at the Church was |
| 12 | indisputably intended to include the substantial services he rendered for Friends |
| 13 | Media in connection with the filming of *Not Today*. For example, a draft agreement |
| 14 | for Van Dyke's services as a director was apparently circulated but never executed. |
| 15 | (*See* Van Dyke Decl. ¶ 8, Ex. G.) The Court therefore finds a genuine dispute of |
| 16 | material fact exists as to whether Van Dyke was compensated for these services. |
| 17 | Accordingly, Friends Media's motion for partial summary judgment is |
| 18 | DENIED with respect to the seventh through tenth causes of action. |

## V. Conclusion

For the reasons stated above, Friends Media's Motion is DENIED.

**SO ORDERED**

DATE: July 23, 2014       _____JOSEPHINE L. STATON_____
                          HONORABLE JOSEPHINE L. STATON
                          UNITED STATES DISTRICT JUDGE

13